J-S31020-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSE MIGUEL MORALES III | : | |
| | : | |
| Appellant | : | No. 1852 MDA 2019 |

Appeal from the Judgment of Sentence Entered May 30, 2019
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0007877-2017

BEFORE: BOWES, J., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY DUBOW, J.: **FILED AUGUST 19, 2020**

Appellant, Jose Miguel Morales, III, appeals from the May 30, 2019 Judgment of Sentence entered in the York County Court of Common Pleas following his jury conviction of Drug Delivery Resulting in Death ("DDRD"), Criminal Use of a Communication Facility ("CUCF"), Involuntary Manslaughter, and Delivery of Fentanyl.[1] Appellant challenges the sufficiency of the evidence underlying his convictions and the discretionary aspects of his DDRD sentence. After careful review, we affirm.

The relevant facts and procedural history are as follows. The Commonwealth charged Appellant with the above crimes following the March 18, 2017 death of Derek Mount (the "Victim") from a fentanyl overdose. The

_____

[1] 18 Pa.C.S. §§ 2506(a), 7512(a), 2504(a), and 35 P.S. § 780-113(a)(30), respectively.

Commonwealth alleged that Appellant supplied the Victim, his friend, with the fatal fentanyl.

Appellant proceeded to a jury trial at which the Commonwealth presented the testimony of, *inter alia*, the Victim's mother Denise Pazdan, the Victim's brother Weston Pazdan, the Victim's friend Christopher Hartlove,[2] the Victim's girlfriend Stephanie Garrett, York County Detective Scott James, Police Detective Russell Schauer, and Springettsbury Township Police Detective Chad Moyer.[3] Appellant did not testify on his own behalf.

Ms. Pazdan testified that the Victim had had a drug addiction since 2014. N.T., 3/19/19, at 144. She testified that, several times before and during the week prior to the Victim's death, Appellant, whom she knew as "Julio," visited their home, including two days prior to the Victim's death when the Victim met Julio outside the family's home to loan him a video game. *Id.* at 147-48, 152. She stated that each time the Victim met with Appellant his behavior and his mood changed, he became argumentative, he would make excuses

---

[2] Owing to Mr. Hartlove's anticipated unavailability, he testified by deposition on February 27, 2019 and the Commonwealth read Mr. Hartlove's deposition testimony into the trial record. *See* N.T., 3/19/19, at 196-217.

[3] The Commonwealth also introduced the testimony of Nadine Koenig, the forensic toxicologist who wrote the toxicology report prepared as part of the Victim's autopsy, and Barbara Bollinger, the forensic pathologist who performed the Victim's autopsy. N.T., 3/20/19, at 307-343. These experts testified that the Victim had fentanyl in his bloodstream at the time of his death and that his use of fentanyl caused his death. *Id.* at 329.

not to spend time with the family, and he appeared intoxicated. *Id.* at 152-53.

Mr. Hartlove testified that at approximately 9:00 PM on March 17, 2017, he drove the Victim to pick up some video games from "a friend." N.T., 2/27/19, at 8-9. He stated that, on the way, they stopped at a bank so the Victim could withdraw money. *Id.* at 15. He then drove the Victim to an alleyway and parked, and the victim left the car and walked down the alleyway alone.[4] *Id.* at 10, 15. Approximately 15 to 20 minutes later, the Victim returned to the car. *Id.* Upon his return, the Victim "nodded off a couple of times" and was unable to hold a conversation with Mr. Hartlove. *Id.* at 11. Mr. Hartlove testified that the Victim had not been acting like this before he exited the vehicle. *Id.* at 11, 14. He also testified that he had seen the Victim like this on prior occasions and that, "[t]here wasn't a doubt in my mind that I knew [the Victim] had probably done something that he shouldn't have and he was under the influence." *Id.* at 14. He testified that he drove the Victim home, and stayed to play video games, leaving at around 11:30 PM. *Id.* at 15-16.

Weston Pazdan, the Victim's brother, testified that he lived with the Victim at the time of the Victim's death. N.T., 3/19/19, at 170. He testified that he knew the Victim's associate "Julio," and identified Appellant as the

_____

[4] Detectives identified this alleyway as three doors down from Appellant's residence. N.T., 3/20/19, at 409.

- 3 -

person he knew as "Julio." *Id.* at 170, 176-77. He testified that he knew that the Victim and Julio would often swap video games. *Id.* at 174.

Stephanie Garrett, the Victim's girlfriend, testified that she was aware that, in 2016, the Victim bought drugs from "one main person in particular . . . 'Gino'" *Id.* at 223, 231. She testified that the Victim had cooperated with the police in their arrest of "Gino" and could no longer obtain drugs from him. *Id.* at 223-25. She stated that the Victim also obtained drugs from "Julio," and that she was not aware of the Victim buying drugs from any other dealers. *Id.* at 224-25. She further testified that, after the Victim died, she called Appellant to inform him and, at first, he cried but then he became "worried." *Id.* at 225-26. She testified that she spoke with the police about the phone call she had made to Appellant after the Victim's death and provided them with "Julio's" phone number. *Id.* at 227.

York County Detective Scott James testified as an expert in the area of forensic cell phone analysis. *Id.* at 242. He stated that the Springettsbury Township Police Department requested him to perform analyses of two cell phones—an LG and a Kyocera—recovered from the Victim during the investigation. *Id.* at 242-43. Detective James testified that he examined the Kyocera phone manually and found on it a text message conversation that "appeared to be drug related." *Id.* at 245-46, 253. He also testified that he found incoming and outgoing messages from a phone number connected to Appellant. *Id.* at 245, 254-56.

Detective James further testified that he performed a data extraction of the LG phone. *Id.* at 247. He stated that the LG phone, like the Kyocera phone, also had incoming and outgoing text messages and phone calls to a phone number associated with Appellant. *Id.* at 258, 262. Detective James specifically testified that the Victim and Appellant exchanged a series of phone calls and text messages on both March 16, 2017, and March 17, 2017, in the hours immediately preceding the Victim's death. *Id.* at 263-268.

York County Drug Task Force member Detective Russell Schauer testified that he assisted Detective Chad Moyer in investigating the Victim's fatal drug overdose. *Id.* at 346. He testified that Appellant went by the nicknames "King Chance" and "Julio." *Id.* at 346-47. Detective Schauer testified that, when he arrested Appellant, Appellant made a verbal statement to him, which Detective Schauer memorialized in writing and Appellant signed.[5] *Id.* at 350. In his statement, which the trial court admitted into evidence, Appellant indicated that he and the Victim had used drugs together, including heroin and fentanyl. *Id.* at 351-52. Appellant also stated that "[t]he thought of me being the person responsible for his death crossed my mind a couple times," and that he "changed [his] number so [he] couldn't be implicated in his death." *Id.* Appellant also indicated in his statement that,

---

[5] Appellant indicated that he could not read or write English, but could understand it. Detective Schauer testified that he had had numerous prior contacts with Appellant and that Appellant did not appear to have any difficulty speaking English. N.T. at 353-54.

at the time of the Victim's death, he had been living at 601 West King Street in York and that the Victim would come to his house to play video games and use heroin and fentanyl. *Id.* at 352. He admitted that it is possible that he saw the Victim on March 17, 2017, but that, if he did, he was under the influence of drugs and did not remember. *Id.*

Detective Schauer testified that, in 2016, the Victim had assisted him as a confidential informant, which resulted in the arrest of the Victim's drug dealer, Jaime Ramos. *Id.* at 354. He confirmed that, after police arrested Ramos, the Victim was unable to purchase drugs from him. *Id.* at 356.

Detective Moyer testified that when he arrived at the scene of the Victim's death on March 18, 2017, he recovered a Kyocera phone from the Victim's nightstand and an LG phone from the Victim's mother. *Id.* at 400-01, 403. He explained that he sent the phones to Detective James for analysis. *Id.* at 405. He testified that he spoke with Mr. Hartlove in an attempt to ascertain where Mr. Hartlove had brought the Victim on the evening before he died. *Id.* 406. Mr. Hartlove identified an alleyway three doors away from Appellant's residence. *Id.* at 409, 417-18.

Detective Moyer further testified that Appellant confirmed that he was the owner of the phone number that had participated in numerous phone calls and text message conversations with the Victim in the days leading up to the Victim's death. *Id.* at 417. Appellant, however, denied making the calls or having conversations with the Victim. *Id.* at 418. Detective Moyer stated

that he manually examined the Kyocera phone and located drug-related messages. *Id.* at 419.

On March 21, 2019, the jury convicted Appellant of the above charges. The trial court deferred sentencing pending preparation of a Pre-Sentence Investigation ("PSI") report. On May 30, 2019, the trial court sentenced Appellant to a term of 20 to 40 years' incarceration for his DDRD conviction and a concurrent term of 3½ to 7 years' incarceration for his CUCF conviction.[6]

On June 6, 2019, Appellant filed a timely Post-Sentence Motion in which he challenged, *inter alia*, the discretionary aspects of his sentence. **See** Motion, 6/6/19 at ¶ 13 ("The statutory maximum sentence of 20 to 40 years was unreasonable and without proper express or implicit consideration. The noted factors were already considered in the elements of the crimes, including [the Victim's] death, the delivery of drugs, and prior convictions."). On October 29, 2019, the trial court denied Appellant's Post-Sentence Motion.

This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following two issues on appeal:

1. Was the evidence insufficient to convict [Appellant] of any of the charged offenses where they all hinged on delivery of fentanyl and the Commonwealth failed to prove beyond a reasonable doubt that it was [Appellant] who made the delivery?

2. Did the court improperly give [Appellant] the maximum sentence for DDRD in large part because of the death of the

---

[6] Appellant's Involuntary Manslaughter and Delivery of Fentanyl convictions merged for purposes of sentencing.

[V]ictim, an element of the offense, and [Appellant's] prior convictions, which are already factored into the sentencing guidelines?

Appellant's Brief at 4.

In his first issue, Appellant challenges the sufficiency of the Commonwealth's evidence in support of "any of [his] convictions." *Id.* at 24.

"A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000). "We review claims regarding the sufficiency of the evidence by considering whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." ***Commonwealth v. Miller***, 172 A.3d 632, 640 (Pa. Super. 2017) (internal quotation marks and citation omitted). "Further, a conviction may be sustained wholly on circumstantial evidence, and the trier of fact—while passing on the credibility of the witnesses and the weight of the evidence—is free to believe all, part, or none of the evidence." *Id.* (citation omitted). "In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder." *Id.* (citation omitted).

Appellant challenges the evidence supporting his convictions. Appellant's Brief at 24-30. He argues that the Commonwealth failed to prove that he was the person who delivered the fentanyl because it offered only "suspicion and conjecture," and not actual direct or circumstantial evidence,

to prove delivery of fentanyl, which he alleges is the "essence of each charge." *Id.* at 24-25, 29.

Delivery of a controlled substance is an element of the offenses of DDRD and Delivery of Fentanyl. With respect to DDRD, Section 2506 of the Crimes Code states, in relevant part, "[a] person commits a felony of the first degree if the person intentionally . . . delivers, . . . sells or distributes any controlled substance . . . , and another person dies as a result of using the substance." 18 Pa.C.S. § 2506(a).

The Controlled Substance, Drug, Device and Cosmetic Act prohibits the delivery of a controlled substance without proper authorization. 35 P.S. § 780-113(a)(30). "Delivery" is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance[.]" 35 P.S. § 780-102. "A defendant actually transfers drugs whenever he physically conveys drugs to another person." *Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004).

A defendant is guilty of CUCF if he intentionally, knowingly, or recklessly used one or more cell phones to facilitate the commission of a felony. 18 Pa.C.S. § 7512(a). *Commonwealth v. Moss*, 852 A.2d 374, 382 (Pa. Super. 2004). Instantly, the Commonwealth alleged that Appellant used a cell phone to facilitate his Delivery of Fentanyl.

The Crimes Code defines Involuntary Manslaughter as, when as a direct result of the commission of "an unlawful act in a reckless or grossly negligent manner" or the commission of "a lawful act in a reckless or grossly negligent

manner," the defendant causes the death of another person. 18 Pa.C.S. § 2504(a).

The Commonwealth's evidence, as set forth above and viewed in the light most favorable to the Commonwealth as verdict-winner indicates, *inter alia*, that: (1) the Victim had assisted the police in arresting the Victim's former drug dealer, "Gino," and could not, therefore, purchase drugs from him anymore; (2) Appellant had a history of, and had admitted to, selling drugs to and exchanging drugs with the Victim, including fentanyl; (3) since he could no longer purchase drugs from Gino, Appellant was the only drug dealer who provided drugs to the Victim; (4) Appellant and the Victim also had a history of sharing video games; (5) Appellant went by the nickname "Julio;" (6) in the hours before his death, the Victim told his mother that he was going to meet Julio and that he was lending Julio a video game; (7) in the hours before his death, the victim went by car with Mr. Hartlove to a bank, withdrew money, and walked down an alley three houses away from Appellant's residence; (8) the Victim returned to the car, and he appeared under the influence; (9) there were several calls and text messages between Appellant's phone and the Victim's phone in the hours before the Victim died; (10) Appellant changed his phone number after the Victim's death so that he would not be implicated in it; and (11) the thought that Appellant had been responsible for the Victim's death had occurred to Appellant.

In support of his sufficiency challenge, Appellant argues that none of the Commonwealth's witnesses testified that they saw Appellant with the Victim

on the night the Victim died. Appellant's Brief at 25. He also asserts that the Commonwealth failed to prove that the Victim received the fentanyl from Appellant or that the Victim received the fentanyl on the night of his death and not on some earlier occasion. *Id.* Appellant argues that evidence that Appellant and the Victim, who were friends, spoke on the telephone on the night of the Victim's death, without information pertaining to the content of the calls, does not prove that Appellant delivered fentanyl to the Victim. *Id.* at 26. Last, Appellant complains that the police recklessly failed to explore alternative suspects in dereliction of their duty.[7] *Id.* at 29.

Appellant's argument fails to garner relief. In light of the evidence presented by the Commonwealth, including the testimony of the Victim's mother, brother, girlfriend, and friend, the jury reasonably inferred that: (1) at the time of his death, Appellant was the Victim's only drug dealer; (2) the Victim used the pretext of exchanging video games with Appellant to purchase drugs from him; (3) in the hours before his death, the Victim and Appellant

---

[7] Appellant also asserts that: (1) the police statement written by Detective Schauer and signed by Appellant is insufficient proof of his guilt because it "is not particularly incriminating," and "of dubious legitimacy"; and (2) the "shoddy police work involved in this case leaves plenty of room for doubt." *Id.* at 26-28. These assertions challenge the weight the jury gave to the Commonwealth's evidence. Appellant did not raise a challenge to the weight of the evidence in his Pa.R.A.P. 1925(b) Statement or in his Statement of Questions Involved in his Brief to this Court. Accordingly, he waived any weight challenges and we will not address them. *See* Pa.R.A.P. 1925(b)(4)(vii) (explaining that any appellate issues not raised in a compliant Rule 1925(b) statement are waived); Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

communicated by phone to arrange a drug buy; (4) in the hours before his death, the Victim went to Appellant's residence where he used money that he withdrew from the bank to purchase drugs from Appellant; (5) the Victim used some of the fentanyl he purchased while at Appellant's residence and took the rest home; (6) the Victim used the remaining fentanyl after he got home and died sometime that night as a result. Accordingly, Appellant's challenge to the sufficiency of the evidence is without merit.

In his second issue, Appellant claims that the trial court erred in imposing a 20 to 40 year sentence for his DDRD conviction, asserting that the court improperly considered only the facts of the Victim's death and Appellant's prior criminal history when it imposed the sentence.[8] Appellant's Brief at 30, 32-37. Appellant's claim presents a challenge to the discretionary aspects of his sentence.

Challenges to the discretionary aspects of sentencing are not automatically reviewable as a matter of right. *Commonwealth v. Hunter*, 768 A.2d 1136, 1144 (Pa. Super. 2001). Prior to reaching the merits of a discretionary sentencing issue, we must determine: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved

---

[8] The court indicated that, based on Appellant Prior Record Score of 5 and the Offense Gravity Score for DDRD of 13, the applicable mitigated range sentence would be 7 to 14 years' incarceration, the standard range sentence would be 8 to 16 years' incarceration, the aggravated range sentence would be 10½ to 21 years' incarceration. The court noted that it could impose a maximum sentence under the guidelines of 20 to 40 years' incarceration. *See* N.T. Sentencing, 5/30/19, at 11, 38-41. *See also* Commonwealth's Memorandum of Law in Support of Sentencing Recommendation, 5/21/19, at 2, 7.

at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief sufficiently addresses the challenge in a statement included pursuant to Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. **Commonwealth v. Evans**, 901 A.2d 528, 533 (Pa. Super. 2006).

Here, Appellant satisfied the first three elements by filing a timely Notice of Appeal, preserving the issue in a Post-Sentence Motion, and including a Rule 2119(f) Statement in his Brief to this Court. Thus, we consider whether Appellant has presented a substantial question for review.

An appellant raises a "substantial question" when he "sets forth a plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of the sentencing process." **Commonwealth v. Crump**, 995 A.2d 1280, 1282 (Pa. Super. 2010) (citation omitted).

Here, Appellant claims that the court "largely based [Appellant's] extreme sentence on improper factors: an element of the offense and [Appellant's] prior convictions." Appellant's Brief at 30-31. A claim that the sentencing court considered improper factors presents a substantial question. **Commonwealth v. King**, 182 A.3d 449, 454 (Pa. Super. 2018).

We review discretionary aspects of sentence claims under the following standard: "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." **Commonwealth v. Barnes**, 167 A.3d 110,

- 13 -

122 n.9 (Pa. Super. 2017) (*en banc*) (citation omitted). A sentencing court has broad discretion in choosing the range of permissible confinement that best suits a particular defendant and the circumstances surrounding his or her crime. ***Commonwealth v. Celestin***, 825 A.2d 670, 676 (Pa. Super. 2003).

The Sentencing Code sets forth the considerations a sentencing court must take into account when formulating a sentence, stating that

> the court shall follow the general principle that the sentence imposed should call for total confinement that is consistent with the . . . protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S. § 9721(b). "In every case where the court imposes a sentence [] outside of the guidelines . . . the court shall provide a contemporaneous written statement of the reason or reasons for the deviation from the guidelines[.]" ***Id.***

Moreover, this Court has observed that

> although the sentencing guidelines are an important factor in sentencing, they are but only one factor when determining an individualized sentence: The guidelines have no binding effect, create no presumption in sentencing, and do not predominate over other sentencing factors – they are advisory guideposts that are valuable, may provide an essential starting point, and that must be respected and considered; they recommend, however, rather than require a particular sentence.

***Commonwealth v. Holiday***, 954 A.2d 6, 13 (Pa. Super. 2008) (citation, paragraph break, and brackets omitted).

"[W]hen fashioning a sentence, a sentencing court may not 'double count' factors already taken into account in the sentencing guidelines."

- 14 -

*Commonwealth v. Goggins*, 748 A.2d 721, 732 (Pa. Super. 2000). This Court has held, however, that, while it is impermissible for a court to "double count" factors already included within the sentencing guidelines as the **sole** reason for increasing a sentence to the aggravated range, sentencing courts may consider "other factors already included in the guidelines if, they are used to supplement other extraneous sentencing information." *Commonwealth v. Simpson*, 829 A.2d 334, 339 (Pa. Super. 2003) (explaining that the sentencing court did not abuse its discretion in considering the defendant's prior conviction history in conjunction with other factors like the impact on his victim, the threat he posed to the community, the lack of successful rehabilitation, and the fact that he was on probation and under supervision at the time of the offense).

Finally, where, as here, the sentencing court had the benefit of a PSI, "it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." *Commonwealth v. Ventura*, 975 A.2d 1128, 1135 (Pa. Super. 2009) (citation omitted). "The sentencing judge can satisfy the requirement that reasons for imposing sentence be placed on the record by indicating that he or she has been informed by the [PSI]; thus properly considering and weighing all relevant factors." *Id.* (citation omitted).

In its Memorandum Order Denying Defendant's Post-Sentence Motion, the trial court explained, with citation to the sentencing transcript, that it considered the factors set forth in 42 Pa.C.S. § 9721(b) when imposing

Appellant's sentence. Specifically, the trial court noted that it considered: (1) Appellant's PSI report; (2) argument of counsel; (3) Appellant's statement to the court; (4) the mitigated, standard, and aggravated range sentences for DDRD; (5) the Offense Gravity Score for DDRD; (6) Appellant's Prior Record Score; (7) the manner, nature, and circumstances of the crime. Trial Ct. Order, 10/29/19, at 13-14 (citing N.T. Sentencing at 4-8,10-34, 38-39, 41-42).

In addition, our review of the Notes of Testimony reveals that the trial court placed on the record the following reasons in support of Appellant's sentence: (1) Appellant's recidivism; (2) the impact of Appellant's crimes on the Victim, the Victim's family, and the community; (3) its concern for the safety of the community; (4) its conclusion that a relatively short period of incarceration would not sufficiently deter Appellant from continuing to engage in criminal activity; and (5) Appellant has continued dealing drugs even though he has had the opportunity to rehabilitate himself. N.T. Sentencing at 43-45.

Following our review, we conclude that, contrary to Appellant's assertions, the trial court did not impermissibly "double count," or rely exclusively on the facts of the Victim's death and Appellant's prior convictions in fashioning Appellant's sentence. Rather, to the extent that the trial court considered Appellant's prior criminal convictions and that his crime resulted in the Victim's death, it considered them in conjunction with many other factors including Appellant's PSI Report, the sentencing guidelines, the nature and

circumstances of the offense, and Appellant's character, including his criminal and social history, when imposing his sentence. Accordingly, the court did not abuse its discretion in imposing Appellant's 20 to 40 year sentence for his DDRD conviction. Appellant's claim, thus, warrants no relief.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/19/2020